*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DEMAL UMAH SIMMONS,

Defendant-Appellant.

UNPUBLISHED
June 20, 2019

No. 341446
Macomb Circuit Court
LC No. 2017-001266-FC

Before: BECKERING, P.J., and CAVANAGH and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of kidnapping, MCL 750.349, and attempted third-degree criminal sexual conduct (CSC-III), MCL 750.92; MCL 750.520d(1)(b). Defendant was sentenced to 12 to 30 years' imprisonment for his kidnapping conviction and two to five years' imprisonment for his attempted CSC-III conviction, to be served concurrently. This matter arises out of defendant's kidnapping and attempted rape of a high school student, and the only arguments he raises on appeal pertain to the effectiveness of his trial counsel. We affirm.

## I. BACKGROUND

On November 28, 2016, the victim, who was at the time a 16-year-old high school student, noticed a person, later identified as defendant, while she was walking to school. After defendant had a brief conversation with the victim, the victim continued to walk to school, and defendant got into a black or navy truck. Defendant's truck traveled in the same direction as the victim. Defendant then stopped and exited his truck to ask the victim for directions to a gas station. The victim provided defendant with directions and showed him a map on her cell phone; she then stated that she needed to get to school and tried to walk away. Defendant told the victim, "don't move or I'll shoot you." Defendant had one hand in his pocket, and the victim initially believed it looked as if he had a gun. The victim later realized that it did not feel like a gun when defendant pressed it against her rib cage as she entered defendant's truck.

Defendant grabbed the victim's neck and pulled her into the truck through the driver's side door, with his other hand pressed against the victim's rib cage. Defendant then placed the

victim's backpack and trumpet in the back seat. Once inside the truck, defendant removed his sweatpants, exposed his penis, and demanded oral sex. The victim refused, hit defendant in the neck and struggled with defendant as she tried to escape. The victim believed that "he was trying to crawl on top of me and I was like kicking him with my feet and my shoes like slipped off." The victim further managed to open the passenger door as she kicked defendant. The victim eventually escaped and ran away, leaving behind her shoes, wallet, glasses, backpack, and trumpet. Defendant did not chase the victim. The victim ran to a friend's house, where she told the friend's father about the incident. The father initially looked for defendant's truck, but then he and the victim reported the incident to two Saint Clair Shores Police Officers in the area, Mitchel Morano and Jack Raymond.

Officers Morano and Raymond stated that the victim did not have shoes and appeared "extremely upset." The victim described the incident and described defendant as a black male, about 20 to 30 years old, clean shaven, wearing a black jacket and a Seattle Seahawks hat, and driving a gray Dodge Ram pickup truck. Officer Morano broadcasted a local "be on the lookout" (BOL), which is where a police officer gives "the information to [the] dispatch center [to] broadcast that information to the local police agencies [for the police] to keep an eye out for that vehicle or that suspect." Later that morning, a local resident discovered a backpack, musical instrument, shoe, and eyeglasses in the street; they were determined to belong to the victim. Also on the same day, the victim was interviewed by the police, and a police artist prepared a sketch of defendant based on the victim's description. At trial, the victim affirmed that the sketch resembled her recollection of defendant's appearance.

Within the next few days, Clinton Township Police Detective Thomas Michael Hill became aware of a law enforcement bulletin that included a photograph taken of a person at a Roseville Wal-Mart. The person had the same facial features, hairstyle, and age, and wore the same hat, as the suspect in the victim's case. Detective Hill additionally noted that the photograph also resembled the police artist sketch, which had previously been published in a local newspaper. On December 2, 2016, Detective Hill contacted Saint Clair Shores Detective Gordon Carrier and sent him the pictures.

On December 7, 2016, Detective Carrier interviewed defendant based on Detective Hill's pictures. Detective Carrier doubted defendant's version of events because he perceived multiple signs of deception. Detective Carrier testified that he did not assume all police reports were completely accurate, and during the interview, he and his partner suggested to defendant that it was possible that defendant had merely given the victim a ride. Defendant told Detective Carrier that the victim had gotten into his truck voluntarily, he admitted that he exposed himself and asked for oral sex, and stated that the victim "freak[ed] out" and hastily left the vehicle. Detective Carrier explained that he believed defendant was not being honest in part because "he basically went along with a lot of our explanations" and added few details beyond those establishing that he had been present with the victim. Detective Carrier also believed that defendant's body language suggested dishonesty. A few days later, the victim picked defendant out of a photographic lineup. The victim had difficulty with the photographic identification because "the picture is a little different than seeing the actual face." Defendant refused to participate in a corporal lineup.

Detective Carrier further testified that it was uncommon to interview a victim multiple times, but he re-interviewed the victim in this case because there were some similarities between the victim's and defendant's versions of events. He wanted to further compare the two situations to determine whether the victim's description would change, as a way to evaluate whether she or defendant were telling the truth. Detective Carrier explained that the victim's version of events remained "very consistent."

Defendant was convicted of kidnapping and attempted CSC-III. Defendant was sentenced to 12 to 30 years' imprisonment for his kidnapping conviction and two to five years for his CSC-III conviction.

## II. EFFECTIVENESS OF DEFENSE COUNSEL

Defendant argues that he is entitled to a new trial because defense counsel was ineffective for (1) failing to object to Detective Carrier's testimony regarding the victim's prior consistent statements, (2) allowing Detective Carrier to vouch for the victim's credibility, and (3) allowing Detective Carrier to testify that he did not believe defendant's version of events, finding him to be deceptive. We agree that significant portions of Detective Carrier's testimony were impermissible. However, some of the improper testimony was elicited by defense counsel rather than the prosecutor, and we are unable to find a reasonable likelihood that any errors by counsel affected the outcome of the proceedings.

Defendant did not move for a new trial or an evidentiary hearing in the trial court, so defendant's claim of ineffective assistance of counsel is unpreserved, and we review his claim for mistakes apparent on the record. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000); *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). To prove ineffective assistance of counsel, a defendant must show "that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52. "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

Defendant contends that defense counsel was ineffective for failing to object to Detective Carrier's testimony regarding the victim's prior consistent statements. According to defendant, Detective Carrier "testified that he re-interviewed [the victim] after hearing [defendant's] exculpatory version of events to see if her story changed base[d] on what the defendant had said, but that her story remained consistent." Defendant also contends that Detective Carrier's testimony regarding the victim's consistent statements constituted improper vouching for the victim's credibility. We agree that Detective Carrier impermissibly vouched for the victim's credibility.

Testimony describing a person's unsworn, out-of-court statements offered to prove the truth of the matter asserted is referred to as hearsay and is generally inadmissible, subject to

some exemptions and exceptions. *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013). "Prior consistent statements are not generally admissible as substantive evidence." *People v Smith*, 158 Mich App 220, 227; 405 NW2d 156 (1987). However, an out-of-court statement offered for any reason other than to prove the truth of the statement is *not* hearsay. *Musser*, 494 Mich at 350. On direct examination, Detective Carrier simply stated that the victim gave two similar statements without reciting what the victim said. Consequently, that portion of Detective Carrier's testimony could not have constituted hearsay.

Witnesses may provide opinions regarding whether objective evidence they observed is consistent with an ultimate fact at issue, or from which the jury could infer a defendant's guilt. See *People v Fomby*, 300 Mich App 46, 48-53; 831 NW2d 887 (2013); *People v James*, 182 Mich App 295, 297-298; 451 NW2d 611 (1990). However, witnesses generally may not comment on the credibility of another person, because the jury is the sole arbiter of credibility. *Musser*, 494 Mich at 348-349. It is clear from context that Detective Carrier's testimony was intended as a commentary on the relative believability of the victim's version of events over defendant's version of events. Detective Carrier specifically stated that the reason for the second interview was "to make sure that she was telling the truth or if our defendant was telling the truth." We agree with defendant's contention that " 'mere repetition does not imply veracity.' " *United States v Bowman*, 798 F 2d 333, 338 (CA 8, 1986)[1] (quoting 4 J Weinstein & M Berger, Evidence ¶ 801(d)(1)(B)[01] at 801–117–18 (1981)). In context, we cannot accept that this testimony was truly offered for the permissible purpose of merely providing context to Detective Carrier's investigation. See *Musser*, 494 Mich at 350. Detective Carrier's commentary on the consistency between the victim's statements constituted improper, and therefore objectionable, vouching for her truthfulness.

The remaining troubling testimony was elicited by defense counsel on cross-examination. Defense counsel asked Detective Carrier to confirm that the second interview occurred "because you got a different explanation as to what happened," to which Detective Carrier agreed that the police wanted "to find out if her story would change, which it did not." We note that there may have been sound strategic reasons for making this inquiry, and in any event, Detective Carrier's answer was not new information to the jury. Detective Carrier's testimony regarding defendant's body language, his reluctance to speak, and his other "multiple signs of deception" was directly responsive to defense counsel's inquiry into why Detective Carrier disbelieved defendant. Again, it is not clear to us that defense counsel asked an obviously improper question, or that defense counsel should have known ahead of time how Detective Carrier would answer. We are therefore unconvinced that it was objectively unreasonable for defense counsel to permit Detective Carrier's testimony.

We emphasize that this testimony *would* have been impermissible had it been elicited on direct examination. The gravamen of Detective Carrier's testimony was that he did not believe defendant's version of events, which is blatantly a comment on defendant's credibility. *Musser*,

---

[1] Opinions of lower federal courts are not binding on this Court. However, we may deem them persuasive. *People v Patton*, 325 Mich App 425, 434 n 1; 925 NW2d 901 (2018).

494 Mich at 348-349. Furthermore, no one is obligated to speak with the police. *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983).[2] Indeed, it is hardly surprising or unusual that someone might be nervous or unenthusiastic about doing so. It is grossly improper to draw any conclusions about a person's credibility or truthfulness because they are reluctant to discuss anything with the police. See *Florida v Bostick*, 501 US 429, 437; 111 S Ct 2382; 115 L Ed 2d 389 (1991). Finally, Detective Carrier was not qualified as an expert on human body language, and even if he had been, he might have been permitted to describe what body language he observed, but would not have been permitted to comment on defendant's truthfulness or veracity. *People v Kowalski*, 492 Mich 106, 129; 821 NW2d 14 (2012) (MARY BETH KELLY, J); *People v Stricklin*, 162 Mich App 623, 637; 413 NW2d 457 (1987). Evaluating a witness's credibility is solely for the jury. *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985). Under the circumstances, however, only the first instance of vouching can be attributed to the prosecution.

Nevertheless, we are not persuaded that different actions by defense counsel would likely have resulted in a different outcome. *Trakhtenberg*, 493 Mich at 51. Critically, this case was not a "pure credibility contest" with a complete lack of other supporting evidence. See *People v Douglas*, 496 Mich 557, 586-588; 852 NW2d 587 (2014). The prosecution's case did not hinge on Detective Carrier's testimony. Police observations and physical evidence supported the victim's version of events. Numerous individuals saw the distraught victim without shoes after the incident. Additionally, the victim's backpack, instrument, shoe, wallet, and glasses were found in the street. Defendant's interview with Detective Carrier was recorded on video, and the recording was played for the jury, so it could draw its own conclusions about defendant's body language and demeanor. Therefore, this was not purely a "credibility contest," as defendant asserts. Because this case did not solely hinge on the victim's credibility, and additional evidence supported her version of events, it is not reasonably probable that defense counsel's conduct affected the outcome of the trial. Accordingly, defendant was not denied the effective assistance of counsel and is not entitled to a new trial.

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Amy Ronayne Krause

---

[2] We furthermore find persuasive Justice BURGER's concurring opinion in *Edwards v Arizona*, 451 US 477, 487-488; 101 S Ct 1880; 68 L Ed 2d 378 (1981), opining that merely telling a detained suspect that he "had to" talk to an officer was sufficient, by itself, to render involuntary the suspect's waiver of his "right to be free from interrogation."